18-3294-cr (L)
*United States v. Eldridge*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2019
Nos. 18-3294-cr (L), 19-92-cr (Con)

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

THAMUD ELDRIDGE, KEVIN ALLEN,
*Defendants-Appellants,*

KASHIKA SPEED, GALEN ROSE,
*Defendants.*[1]

Appeal from the United States District Court
for the Western District of New York
No. 1:09-cr-329 — Richard J. Arcara, *Judge*

ARGUED: MARCH 10, 2020
DECIDED: JUNE 22, 2021

Before: CHIN, SULLIVAN, and NARDINI, *Circuit Judges.*

---

[1] The Clerk of Court is directed to amend the caption as set forth above.

Defendants-Appellants Thamud Eldridge and Kevin Allen appeal from their convictions and sentences in the United States District Court for the Western District of New York (Richard J. Arcara, *J.*).  In this opinion, we resolve three questions: (1) whether the district court's decision to install a waist-high black curtain around the defense tables before trial violated the defendants' right to a fair trial; (2) whether one of Eldridge's two convictions pursuant to 18 U.S.C. § 924(c) was unconstitutional because the jury's verdict rested on one of three predicate offenses, at least one of which is not a crime of violence in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), and this Court's decision in *United States v. Barrett*, 937 F.3d 126 (2d Cir. 2019); and (3) whether Eldridge is entitled to the lower penalty provided for multiple § 924(c) convictions in Section 403(a) of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5221–22, which was enacted after the district court imposed Eldridge's sentence but while his case was pending on direct appeal.  We conclude that the district court's decision to hang the curtain did not violate the defendants' right to a fair trial.  We further hold that, although *Davis* and *Barrett* have invalidated at least one of the three theories upon which Eldridge's second § 924(c) conviction might have been premised, Eldridge has failed to show that any error affected his substantial rights in light of the evidence supporting the third, valid theory— namely, that Eldridge participated in an attempted Hobbs Act robbery.  In reaching this conclusion, we hold that even in cases where an unpreserved claim of error is based on a supervening change in case law, the defendant bears the burden of establishing all four prongs of the plain-error standard.  Finally, we hold that Section 403(a) does not apply to Eldridge because the district court imposed his sentence before Congress passed the First Step Act, and that the pendency of his direct appeal does not change that fact.  We address the defendants' remaining claims in a separate summary order.  Accordingly, we **AFFIRM** Allen's and Eldridge's convictions and sentences.

---

DEVIN MCLAUGHLIN, Langrock Sperry & Wool, LLP, Middlebury, VT, *for Defendant-Appellant Thamud Eldridge*

CHERYL M. BUTH, Meyers Buth Law Group, Orchard Park, NY, *for Defendant-Appellant Kevin Allen*

KATHERINE A. GREGORY, Assistant United States Attorney, *for* James P. Kennedy, Jr., United States Attorney for the Western District of New York, Buffalo, NY, *for Appellee*

WILLIAM J. NARDINI, *Circuit Judge*:

Defendants-Appellants Thamud Eldridge and Kevin Allen appeal from their convictions and sentences after a jury trial in the United States District Court for the Western District of New York (Richard J. Arcara, *J.*).[2] In this opinion, we address three of their arguments. First, the defendants challenge the district court's decision to hang a waist-high black curtain around the defense tables—designed to prevent the jury and spectators from seeing whether the defendants were in leg-irons—arguing that the curtain prejudiced the jury against the defendants and so rendered their trial unfair. Second, Eldridge argues that his

---

[2] Two additional co-defendants, Galen Rose and Kashika Speed, do not appeal from their convictions and sentences.

conviction on Count Seven for possessing and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c), must be vacated in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), and this Court's decision in *United States v. Barrett*, 937 F.3d 126 (2d Cir. 2019), since none of the predicate offenses on which his § 924(c) conviction was based remains a valid crime of violence as defined by the statute. Third, Eldridge argues that he is entitled to a lower sentence on Count Seven—the second of his two § 924(c) convictions—because, after the district court pronounced sentence but while his case was pending on appeal, Congress enacted Section 403(a) of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5221–22, which reduced the mandatory minimum sentence for that count to 7 years rather than 25 years.

We conclude that the presence of the curtain at trial did not infringe the defendants' right to a fair trial and that the district court acted well within its discretion to safeguard courtroom security while minimizing prejudice to the defendants. On the second point, we agree with Eldridge that conspiracy to

4

commit Hobbs Act robbery—one of the three possible predicates for his § 924(c) conviction—is not a crime of violence under *Davis* and *Barrett*. It was therefore error for the court to instruct the jury that all three predicates, including the conspiracy, were crimes of violence for the purposes of § 924(c). But we find that Eldridge has not shown that this error affected his substantial rights, in light of the overwhelming evidence supporting the third, valid theory—namely, that Eldridge attempted to commit Hobbs Act robbery. In reaching this conclusion, we hold that the Supreme Court's recent decision in *Greer v. United States*, No. 19-8709, 2021 WL 2405146, at *4 (U.S. June 14, 2021), abrogated our Circuit's earlier precedent in *United States v. Viola*, 35 F.3d 37, 42–43 (2d Cir. 1994), and that even where an unpreserved claim of error is based on supervening precedent, the defendant bears the burden of establishing all four prongs of the plain-error standard, including that the error affected his substantial rights. On the third point, we hold that Section 403(a) of the First Step Act does not apply to Eldridge because that revised sentence provision applies only "if a sentence for the offense has not been imposed" as of the date of that law's enactment. Eldridge's sentence was imposed

5

when the district court pronounced it, and the pendency of his appeal does not alter that fact. Finally, in a separate summary order, we find that reversal is not warranted on any of the defendants' remaining claims. As a result, we affirm Eldridge's and Allen's convictions and sentences.

## I. BACKGROUND

### A. The Superseding Indictment

In 2009, a federal grand jury indicted Eldridge and Allen, along with co-defendants Kashika Speed and Galen Rose, for offenses arising from their participation in a drug-dealing enterprise that operated in Buffalo, New York, from 2003 to 2005. After many pre-trial motions, the severing of two counts as to Eldridge, and Speed's guilty plea, the defendants went to trial in 2016 on a fifteen-count superseding indictment. As relevant here, Eldridge and Allen were charged as follows:

- Count One (Eldridge and Allen): substantive RICO violation;[3]

---

[3] As part of Count One, the superseding indictment alleged six predicate racketeering acts against Eldridge and four against Allen.

- Count Two (Eldridge and Allen): RICO conspiracy;

- Count Three (Eldridge and Allen): narcotics conspiracy;

- Count Four (Eldridge and Allen): possession of firearms in furtherance of the drug trafficking crime described in Count Three;

- Count Five (Eldridge and Allen): kidnapping in aid of racketeering;

- Count Six (Eldridge and Allen): conspiracy to commit Hobbs Act robbery and attempted Hobbs Act robbery;

- Count Seven (Eldridge and Allen): possessing and brandishing a firearm in furtherance of the crimes of violence charged in Counts Five and Six;

- Count Ten (Eldridge): murder in aid of racketeering;

- Count Eleven (Eldridge and Rose): conspiracy to commit Hobbs Act robbery and attempted Hobbs Act robbery;

- Count Twelve (Eldridge and Rose): discharge of a firearm causing death in furtherance of the crimes of violence charged in Counts Ten and Eleven;

- Count Thirteen (Eldridge and Allen): murder in aid of racketeering;

- Count Fourteen (Eldridge and Allen): conspiracy to commit Hobbs Act robbery and attempted Hobbs Act robbery; and

- Count Fifteen (Eldridge and Allen): discharge of a firearm causing death in furtherance of the crimes of violence charged in Counts Thirteen and Fourteen.[4]

## B.    Installation of the Curtain

During pretrial proceedings, in keeping with the recommendation of the United States Marshals Service, the defendants appeared in court wearing leg shackles, fastened at the ankle.  The Marshals Service was concerned about the defendants' criminal histories, as well as the nature of the charges.

In anticipation of the possibility that the defendants would be shackled during trial, the district court ordered the placement of a waist-high black curtain that ran down the center of the courtroom from the Judge's bench to about three feet from the spectators' gallery, then wrapped around the defense tables to the wall farthest from the jury box.  In this way, neither jurors nor spectators would be able to see the defendants' shackled legs.

---

[4] Counts Eight and Nine charged Rose alone with two drug offenses.

The defendants moved to be unshackled during trial, arguing that such restrictions were unnecessary and prejudicial. On the morning of jury selection, the district court heard argument from the parties as well as the views of the Marshals Service, which reiterated its security concerns, particularly in light of the sensitive and potentially provocative nature of the testimony expected at trial. After considering the matter, the district court granted the defendants' motion but also acknowledged the validity of the Marshals' concerns. The court noted that it was possible that one or more defendants would need to be shackled at some point during trial, but in that event the court stated that it would "have it all covered up here." D. Ct. Dkt. 837 at 6.

When the members of the venire panel first entered the courtroom for jury selection, the curtain was in place. At some point during the first day of jury selection, the defense requested removal of the curtain, and the district court denied that request. The defendants then moved for a mistrial after opening statements, based in part on the presence of the curtain. The district court denied this motion by written order after oral argument.

9

In its ruling, the district court identified several case-specific security considerations. The court cited the defendants' violent criminal histories, including that Allen was already serving a sentence for murder and that Eldridge had previous manslaughter and robbery convictions. The court further noted that the Marshals had identified Rose as a flight risk. Lastly, the court observed that prosecution witnesses had already been threatened, prompting the court to impose a protective order over the witness list and other discovery materials. In light of these circumstances, as well as the nature of the charged offenses, the court concluded it was "certainly not wholly unforeseeable" that shackles would need to be imposed at some point during trial. Allen App'x at 146. The court then held that the continued presence of the curtain in the courtroom was the "least restrictive means" to accomplish the competing goals of ensuring a secure courtroom and minimizing the prejudice faced by the defendants in the event that shackles became necessary later in the trial. *Id.* at 147.

## C. Eldridge's Conviction on Count Seven

As stated above, Count Seven of the indictment charged Eldridge (and Allen) with possessing and brandishing a firearm in furtherance of the crimes of

10

violence charged in Counts Five and Six, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2.[5]   Count Five charged Eldridge and Allen with kidnapping in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2, stemming from an incident in which the defendants forced a victim, Woodie Johnson, into a truck at gunpoint and held him until he provided the defendants with a substantial quantity of narcotics.   Count Six, which was captioned "Hobbs Act Robbery," arose from the same incident and charged as follows:

> On or about February 23, 2005, . . . [Eldridge and Allen] did knowingly, willfully and unlawfully combine, conspire and agree together and with others, known and unknown, to obstruct, delay and affect, and to attempt to obstruct, delay and affect, commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), and the movement of articles and commodities in commerce, in particular, by the robbery and extortion of assets, including controlled substances and money, from Victim B, an individual engaged in the

---

[5] The indictment charged as follows: "On or about February 23, 2005, in the Western District of New York, the defendants, THAMUD ELDRIDGE a/k/a Damu and KEVIN ALLEN, during and in relation to crimes of violence for which they may be prosecuted in a court of the United States, that is, violations of Title 18, United States Code, Sections 1959(a)(1) and 1951, as set forth in Counts 5 and 6 of this Indictment, the allegations of which are incorporated herein by reference, did knowingly and unlawfully use, carry and brandish, and in furtherance of such crimes, did knowingly and unlawfully possess and brandish, a firearm.  All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2."  Gov't App'x at 14.

11

unlawful possession and distribution of controlled substances, including cocaine.

All in violation of Title 18, United States Code, Sections 1951 and 2.

Gov't App'x at 13–14. The parties stipulated that both Counts Five and Six qualified as predicate crimes of violence for purposes of Count Seven, and the district court instructed the jury to that effect.[6]

In charging the jury on Count Six, the district court discussed two separate means by which it could find the defendants guilty, instructing on the elements of a conspiracy to commit Hobbs Act robbery and attempted Hobbs Act robbery. The jury form similarly asked whether the defendants were guilty of either "conspiracy to rob and extort assets, or attempt to rob and extort assets" from the victim. Allen App'x at 189.

---

[6] Likewise, the jury form stated that "[t]he Seventh Count of the Indictment charges Defendants Thamud Eldridge and Kevin Allen with us[ing], carry[ing], and brandish[ing] . . . a firearm in furtherance of the crimes of violence specified in Counts Five and Six of the Indictment, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2." Allen App'x at 190. The form further instructed the jury that "[i]f you found Defendant Thamud Eldridge Guilty of Count 5 or Count 6, then you must make a unanimous finding as to whether Defendant Eldridge is Guilty or Not Guilty of Count 7. If you found Defendant Thamud Eldridge Not Guilty of Count 5 and Count 6, you must find Defendant Eldridge Not Guilty of Count 7." *Id.*

The jury found Eldridge guilty of both Counts Five and Six, as well as Count Seven. As to Allen, the jury could not reach a verdict on Count Five, found him guilty on Count Six, and could not reach a verdict on Count Seven. Eldridge was eventually sentenced to the then-mandatory minimum of twenty-five years of imprisonment for his conviction on Count Seven.

Eldridge was also found guilty on Count One (substantive RICO), Count Two (RICO conspiracy), Count Three (narcotics conspiracy), and Count Four (possession of a firearm in furtherance of the narcotics conspiracy). Allen was found guilty on Counts One, Two, Three, and Four, as well.

The jury found Eldridge not guilty on Count Ten (murder in aid of racketeering). The jury could not reach a verdict as to Eldridge and Rose on Count Eleven (conspiracy to commit Hobbs Act robbery and attempted Hobbs Act robbery) or Count Twelve (possession of a firearm in furtherance of the offenses charged in Counts Ten or Eleven), and as to Eldridge and Allen on Count Thirteen (murder in aid of racketeering), Count Fourteen (conspiracy to commit Hobbs Act

13

robbery and attempted Hobbs Act robbery), and Count Fifteen (possession of a firearm in furtherance of the offenses charged in Counts Thirteen and Fourteen).

As a result, Eldridge was sentenced to a total term of 600 months of imprisonment: 240 months as to each of Counts One, Two, Five, and Six, and 120 months as to Count Three, all to run concurrently with each other; 60 months on Count Four, to run consecutive to all other counts; and, as noted above, 300 months on Count Seven, to run consecutive to all other counts. Allen was sentenced to a total term of 300 months of imprisonment: 240 months as to each of Counts One, Two, and Six, and 60 months on Count Three, all to run concurrently with each other; and 60 months on Count Four, to run consecutive to the other counts.[7]

---

[7] Rose was found guilty of Count Eight (possession with intent to distribute marijuana) and Count Nine (conspiracy to possess with intent to distribute marijuana). He agreed to waive his right to appeal those convictions in exchange for the Government dismissing Counts Eleven and Twelve against him. He was sentenced to 60 months on each count to run consecutively for a total of 120 months of imprisonment.

14

## II.    DISCUSSION

### A.    Fair Trial Claim

The defendants contend that the presence of the curtain beside and behind the defense tables violated their right to a fair trial, inviting the jury to impermissibly decide their guilt "on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial," *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978).  Specifically, the defendants argue that the jury would presume that the curtain was a necessary protective barrier or that it was hiding some form of physical restraint, such as shackles, predisposing the jury to conclude that the defendants were dangerous.  The defendants further argue that the curtain, by virtue of its position in the courtroom, had an independent effect of "subtly encourag[ing] the jury to align themselves with the prosecutors who are, literally speaking, 'on the same side.'"  Allen Br. at 27–28.

In the context of balancing the use of physical restraints or other types of courtroom security with defendants' fair trial rights as enunciated in *Taylor*, a district court is required to determine whether the restraints are "necessary to

maintain safety or security." *United States v. Haynes*, 729 F.3d 178, 189 (2d Cir. 2013) (internal quotation marks omitted). "Any finding of necessity and all accommodations made to minimize the extent of the defendant's restraint during trial or to ensure that the jury does not become aware of any physical restraints on the defendant must be made on the record . . . ." *Id.* at 190. If the district court complies with this rule, we review its decision only for abuse of discretion. *See id.* at 189. However, if the district court "delegates a decision, and gives no reason for the decision, that is not an exercise of discretion but an absence of and abuse of discretion." *Id.* (internal quotation marks omitted).

Here, the district court reasonably determined on the record that it might need to shackle the defendants during trial and that the curtain would minimize any prejudice resulting from the subsequent imposition of physical restraints. We hold that this decision was within the court's discretion. The district court first considered whether it needed to shackle the defendants, before ultimately agreeing with them that such restraints were unnecessary at that time. But the district court also properly considered the possibility that shackles might become

16

necessary later during trial, taking into consideration the security assessment of the United States Marshals Service without delegating its decision to the Marshals. The bases for the Marshals' concerns—that the defendants had extensive and violent criminal histories, were charged with a variety of violent crimes, including murder, and would be hearing sensitive testimony over the course of trial—were reasonable, informed by their expertise, and grounded in the record. And, as the district court rightly noted, the prejudice to the defendants would have been far greater had the need for shackles arisen during trial and the curtain was not yet hung: the jury either would have seen the shackles or walked into a suddenly much-altered courtroom, where a newly installed curtain surrounding the defendants would have invited questions as to the reason for the change. Faced with such considerations, the district court struck a wholly reasonable balance between ensuring courtroom security and protecting the defendants' interests in a fair trial in the event it later imposed physical restraints.

In arguing that the curtain nonetheless impermissibly infringed on their right to a fair trial, Eldridge and Allen rely primarily on *People v. Cruz*, 17 N.Y.3d

941, 944 (2011), a decision of the New York Court of Appeals reversing a trial conviction where the defense table was similarly surrounded by a waist-high black curtain. But *Cruz* presented a very different situation. First, the defendant in *Cruz* was indeed shackled throughout the trial, and it could not be determined from the record that the jury did not see the shackles. *See id.* Second, the trial court in *Cruz* made no findings as to the need for shackles or the need for the continued presence of a curtain in the courtroom. *See id.* Accordingly, the Court of Appeals held that "the use of leg irons" violated that defendant's constitutional rights. *Id.* at 944–45. Here, of course, leg irons were not used at all during the trial. And even with respect to the curtain alone, the district court made explicit and reasonable findings concerning its necessity as a measure to protect the defendants' rights if shackles became necessary.

It is true that in *Cruz*, the Court of Appeals said that, "[o]n the record before" it, the court could not conclude "that the jury, seeing the bunting around the defense table and not the prosecutor's, would not have inferred that it was there to hide shackles on Cruz's legs." *Id.* at 944. Whatever the record might have

contained in *Cruz*, our record does not indicate that the presence of the curtain shielding the defense tables suggested to jurors that the defendants were perhaps shackled (which they were not).[8]  Speculation about speculation provides no basis for reversing these convictions.

## B.     Constitutionality of Eldridge's Conviction on Count Seven

We now turn to Eldridge's claim that his conviction on Count Seven for violating 18 U.S.C. § 924(c)(1)(A)(ii) is unconstitutional because it rested on predicate offenses that are no longer encompassed by § 924(c)'s definition of a crime of violence.  Eldridge argues that all three possible predicate offenses— kidnapping in aid of racketeering (Count Five) and either conspiracy to commit or attempt to commit Hobbs Act robbery (Count Six)—are not crimes of violence.  We agree that conspiracy to commit Hobbs Act robbery is not a crime of violence following *United States v. Davis*, 139 S. Ct. 2319 (2019), and this Court's subsequent

---

[8] That said, in those infrequent cases where a district court makes suitable findings justifying the use of a curtain to mask the actual or potential use of leg shackles, to avoid any arguable prejudice, it might be well advised to place curtains symmetrically—whether directly down the middle of the courtroom, or around both the defense and prosecution tables.

decision in *United States v. Barrett*, 937 F.3d 126 (2d Cir. 2019). The parties also now take the position that kidnapping in aid of racketeering is no longer a crime of violence under those precedents. However, we need not decide that question because we have recently held (after this appeal was briefed and argued) that attempted Hobbs Act robbery remains a crime of violence after *Davis*. *See United States v. McCoy*, 995 F.3d 32, 55 (2d Cir. 2021) (holding that "an attempt to commit Hobbs Act robbery . . . categorically qualifies as a crime of violence" (internal quotation marks, alteration, and citation omitted)). And, as we explain below, we conclude that any *Davis/Barrett* error relating to the Hobbs Act conspiracy and kidnapping predicates did not affect Eldridge's substantial rights under plain-error review, given the strength of the evidence supporting the attempted Hobbs Act robbery predicate and the link between Eldridge's brandishing of the gun and that crime.

In *Davis*, the Supreme Court held that the second prong of § 924(c)'s definition of a crime of violence, the so-called "residual clause," 18 U.S.C. § 924(c)(3)(B), was unconstitutionally vague. *See* 139 S. Ct. at 2323–24, 2336. As a

20

result, offenses that qualified as crimes of violence only via the residual clause—as opposed to the still-valid elements clause of § 924(c)(3)(A)—could no longer serve as predicates for firearms convictions under § 924(c)(1)(A). *See, e.g.*, *Barrett*, 937 F.3d at 128.[9] In light of *Davis* and this Court's subsequent precedent, we are left with the following status of each potential basis for Eldridge's § 924(c) conviction: conspiracy to commit Hobbs Act robbery is not a qualifying predicate; kidnapping might or might not be a qualifying predicate; and attempted Hobbs Act robbery is a qualifying predicate.[10]

Given this mixed bag, we must consider whether Eldridge's Count Seven conviction should be invalidated under the rule of *Yates v. United States*, 354 U.S. 298 (1957), which held that there is constitutional error when "disjunctive theories

---

[9] *Davis* interpreted only the definition of a crime of violence, and thus had no effect on the scope of drug offenses that may also serve as predicates for § 924(c) convictions, *see* 18 U.S.C. § 924(c)(2). As a result, Eldridge's conviction pursuant to Count Four for violating § 924(c), the predicate for which was his conviction on Count Three for narcotics conspiracy, is unaffected.

[10] As both parties rightly note, because Eldridge's case was pending on direct review when *Davis* was decided, the rule of *Davis* applies. *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987); *United States v. Gutierrez Rodriguez*, 288 F.3d 472, 476 n.2 (2d Cir. 2002).

of culpability are submitted to a jury that returns a general verdict of guilty, and [one (or more)] of the theories was legally insufficient." *United States v. Agrawal*, 726 F.3d 235, 250 (2d Cir. 2013) (internal quotation marks and citation omitted).

Eldridge did not raise a *Yates* concern regarding Count Seven below.[11] We review such unpreserved challenges only for plain error. *See id.* (reviewing unpreserved *Yates* challenge for plain error); *see also* Fed. R. Crim. P. 52(b). "[B]efore an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.' If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Johnson v. United States*, 520 U.S. 461,

---

[11] Indeed, the parties stipulated to the fact that each charged predicate offense came within § 924(c)'s definition of a crime of violence. Such an affirmative stipulation normally might give rise to a finding of actual waiver (as opposed to mere forfeiture) of the issue, barring all review on appeal. *See United States v. Olano*, 507 U.S. 725, 733 (1993); *United States v. Yu-Leung*, 51 F.3d 1116, 1121–22 (2d Cir. 1995). On appeal, the Government does not assert that there was a waiver, and so we need not consider that question. *See United States v. Brown*, 352 F.3d 654, 663 (2d Cir. 2003) (recognizing that the Government can "waive the waiver point" (internal quotation marks and alteration omitted)).

466–67 (1997) (alterations omitted) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

Moreover, it is the defendant's burden to "establish[] each of the four requirements for plain-error relief," including that his substantial rights were affected. *Greer*, 2021 WL 2405146, at *4. Where, as here, the defendant's unpreserved challenge is based on a supervening change in precedent, our Court has previously (though not uniformly) applied a form of "modified" plain-error review, where the Government bears the burden to show that the error did not affect the defendant's substantial rights. *See Viola*, 35 F.3d at 42–43. In *Viola*, we reasoned that it was improper to hold a defendant "accountable" for his failure to preserve a claim of error where he "clearly ha[d] no duty to object to a [point of law] that [was] based on firmly established circuit authority." *Id.* at 42. However, we have subsequently (and repeatedly) "express[ed] doubt that the *Viola* gloss on the plain-error standard . . . survived the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461 (1997)," because *Johnson* applied the usual plain-error rule—without modification—when considering an error resulting from a

23

supervening change in case law governing whether the judge or jury must decide the issue of materiality in a perjury prosecution.[12] *United States v. Moore*, 975 F.3d 84, 93 n.37 (2d Cir. 2020) (internal quotation marks omitted).  *See Johnson*, 520 U.S. at 463, 468–69.  The Supreme Court has now clearly abrogated the rule we adopted in *Viola*.  *Greer* involved a supervening change in case law governing the mens rea requirement in felon-in-possession prosecutions, and the Court there held that the defendant must satisfy the usual plain-error standard even though a contemporary objection would have run up against a "uniform wall of precedent." *Greer*, 2021 WL 2405146, at *5; *see id.* at *6.  Accordingly, regardless of whether an unpreserved error becomes apparent only on appeal in light of new case law, it is the defendant who retains "the burden of establishing entitlement to relief for plain error.  That means that the defendant has the burden of establishing each of

---

[12] It is worth noting that in nearly all of those cases, we pointed out that our holding would have been the same regardless of whether the burden of persuasion on prejudice (or lack thereof) had shifted from the defendant to the prosecution.  *See, e.g., United States v. Thomas*, 274 F.3d 655, 668 n.15 (2d Cir. 2001) (en banc); *see also United States v. Vilar*, 729 F.3d 62, 71 n.5 (2d Cir. 2013) ("Indeed, we cannot help but be skeptical that the allocation of the burden of demonstrating harm will ever be dispositive in this context.").

24

the four requirements for plain-error relief." *Id.* at *4 (internal quotation marks and citation omitted).

Turning to Eldridge's conviction on Count Seven, it clearly satisfies the first two prongs of plain-error review, presenting an "error" under *Yates* that is now unquestionably "plain" in light of *Davis*.[13] The violation of § 924(c) charged in Count Seven was predicated on two alternative theories of liability, that Eldridge brandished a firearm while committing either or both of two underlying crimes of violence: the kidnapping charged in Count Five and/or the Hobbs Act robbery violation charged in Count Six. The jury convicted Eldridge of both predicate counts, and the verdict form did not ask the jury to identify on which predicate, or predicates, it was basing its guilty verdict for Count Seven. This problem was complicated by the alternate theories of liability charged within Count Six itself. Count Six charged Eldridge with both conspiracy to commit Hobbs Act robbery

---

[13] To constitute plain error, the error need not be clear in light of the law applicable at the time of trial; "it is enough that an error be 'plain' at the time of appellate consideration." *Johnson*, 520 U.S. at 468; *see also United States v. Dussard*, 967 F.3d 149, 156 (2d Cir. 2020).

*and* attempted Hobbs Act robbery.[14]  Of these two, only attempted Hobbs Act robbery may serve as a predicate crime of violence for a § 924(c) conviction.  And the verdict form again did not specify on which theory of liability the jury convicted Eldridge: conspiracy or attempt.

We find, however, that Eldridge has not shown that this error affected his substantial rights within the meaning of the third prong of our plain-error analysis.  *See Johnson*, 520 U.S. at 467.  The Supreme Court has "noted the possibility that certain errors, termed structural errors, might affect substantial rights regardless of their actual impact on an appellant's trial."  *United States v. Marcus*, 560 U.S. 258, 263 (2010) (internal quotation marks and alteration omitted).

---

[14] Eldridge rightly notes that the wording of the indictment for Count Six was ambiguous: it appears to charge, under one reading, that the defendants conspired to attempt Hobbs Act robbery.  *See* Gov't App'x at 13–14 (charging that the defendants "did knowingly, willfully and unlawfully *combine, conspire and agree* together and with others, known and unknown, *to obstruct*, delay and affect, *and to attempt to obstruct*, delay and affect, commerce" (emphasis added)).  Putting aside that conspiracy to attempt a substantive crime is not a recognized form of liability—and thus such a reading of the ambiguous indictment language would be inappropriate—the jury instructions and the verdict form were quite clear that Count Six encompassed separate theories of conspiracy to commit and attempt to commit Hobbs Act robbery.  In any event, Eldridge does not argue that this discrepancy rendered his Count Six conviction erroneous, and it also does not materially affect the *Yates* analysis concerning Count Seven.

But "[a]n instructional error arising in the context of multiple theories of guilt"—

*i.e.*, a *Yates* error—is not such a structural error because it "no more vitiates *all* the

jury's findings than does omission or misstatement of an element of the offense

when only one theory is submitted." *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008); *see*

*also Skilling v. United States*, 561 U.S. 358, 414 n.46 (2010) (holding that *Hedgpeth's*

harmless-error approach applies on direct appeal). We have applied harmless-

error analysis when the instructional error undermined the validity of one object

of a multiple-object conspiracy. *See United States v. Coppola*, 671 F.3d 220, 237 (2d

Cir. 2012). And, where a defendant did not preserve his *Yates* challenge by raising

it before the district court, we have also held that an instructional error on one of

two theories of guilt did not affect the defendant's substantial rights under a plain-

error analysis where it was "overwhelmingly likely that any reasonable juror

would have convicted on the basis of the Government's primary theory." *United*

*States v. Skelly*, 442 F.3d 94, 99 (2d Cir. 2006). We now hold that this approach to

*Yates* errors applies with equal force when there has been instructional error on one or more predicate offenses for a § 924(c) firearms charge.[15]

Accordingly, we evaluate the district court's instructional error as we would any other erroneous jury instruction under plain-error review, focusing on whether Eldridge has shown that he was prejudiced by the error.[16] We conclude

---

[15] We join our sister circuits in reaching this conclusion. *See, e.g.*, *United States v. Ali*, 991 F.3d 561, 572, 575 (4th Cir. 2021) (applying plain-error review where the defendant had not objected to the § 924(c) instructions at trial); *United States v. Jones*, 935 F.3d 266, 270 (5th Cir. 2019) (same); *United States v. Cannon*, 987 F.3d 924, 934, 947 (11th Cir. 2021) (applying harmless-error review where the defendants had objected to the § 924(c) instructions in light of *Johnson v. United States*, 576 U.S. 591 (2015)).

[16] Our Circuit has used different verbal formulations to describe the standard for evaluating whether a defendant's substantial rights have been affected by an erroneous jury instruction under plain-error review. In *United States v. Marcus*, the Supreme Court evaluated an instructional error under plain-error review and held that that, "[i]n the ordinary case," the question is whether a defendant has been "prejudic[ed]" by the error—*i.e.*, whether there is "a reasonable probability that the error affected the outcome of the trial." 560 U.S. at 262. In light of *Marcus*, we have applied this "reasonable probability" phrasing on several occasions when evaluating instructional errors, including *Yates* errors like the one here. *See, e.g.*, *Agrawal*, 726 F.3d at 250. But we have also evaluated such *Yates* errors under the third prong of plain-error review by asking whether "the jury would have returned the same verdict beyond a reasonable doubt." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (quoting *United States v. Nouri*, 711 F.3d 129, 140 (2d Cir. 2013)). We do not think that there is an appreciable difference between these standards, in practice, as "a reasonable probability" that the error affected the outcome of the trial would seem to encompass whether a jury could have formed "reasonable doubts" absent the error. Thus, to the extent there might be any doubt as to what the "reasonable probability" test means in the context before us, it is resolved by acknowledging that it means the erroneous jury instruction was "harmless beyond a reasonable doubt."

that Eldridge was not prejudiced by the district court's erroneous instruction with respect to the valid predicate crimes of violence, because the jury would have returned a guilty verdict on Count Seven even if it had been instructed that only attempted Hobbs Act robbery was a valid predicate under § 924(c).

Here, there was strong evidence that Eldridge did, in fact, attempt to commit the Hobbs Act robbery of Woodie Johnson that was charged in Count Six. The testimony regarding Eldridge's participation in the robbery showed that: he had a gun with him when planning the robbery in the basement on Newburgh Street; he pointed a gun at Johnson to force him onto the ground before abducting him into the truck; he drove the truck with Johnson in the back, flanked by Allen and Speed, to an abandoned house where Johnson called his drug contact to leave two kilos of cocaine on a porch; he drove the truck to the location of the drugs; he got out of the truck and retrieved the drugs from the porch; he proceeded to tell Johnson that he had done the right thing; the next day, Allen told a friend that he, Eldridge, and Speed had committed the robbery; and subsequently, during an encounter in a jail visiting room, Eldridge bragged to Johnson that he was the one who "did that to

29

you on Kensington." Tr. at 1311. All of this testimony was entwined—with the agreement to commit the robbery, the attempt to commit the robbery, the kidnapping, and Eldridge's brandishing of the gun forming part of a single narrative. On this evidence, it is inconceivable that the jury could have returned a guilty verdict on any of these counts (as it did on all of them) without concluding that, at a minimum, Eldridge attempted to rob Johnson of his drugs, and that he did so using a gun.

Indeed, the guilty verdicts on Counts Five, Six, and Seven, viewed together, reinforce the conclusion that the jury would have convicted Eldridge on Count Seven even if the only theory had been attempted robbery. The only meaningful difference between the conspiracy and attempt charges in Count Six is that for the former, Eldridge had to have reached an agreement with another person to commit the robbery; while for the latter, he had to have taken a substantial step to actually commit the robbery. By returning a guilty verdict on the kidnapping count (Count Five), the jury necessarily concluded that Eldridge had gone far beyond the planning stages and actually engaged in the abduction that formed the

30

basis for the robbery charge. That is far more than the substantial step needed to prove an attempt. And the evidence presented at trial amply revealed that the purpose of the kidnapping was to rob Johnson of his drugs. Thus, there can be no doubt that the jury—which clearly found Eldridge guilty of brandishing a firearm by returning its guilty verdict on Count Seven—would have concluded that he did so during and in relation to an attempted Hobbs Act robbery. Accordingly, we find no basis for vacating Eldridge's conviction on Count Seven.

## C.     Application of the First Step Act to Count Seven

On the day Eldridge was sentenced—September 10, 2018—18 U.S.C. § 924(c)(1)(C) provided that a "person shall [] be sentenced to a term of imprisonment of not less than 25 years" in cases of "a second or subsequent conviction under" § 924(c). At that time, the law in this Circuit was clear: "a second or subsequent conviction under" § 924(c) included "multiple § 924(c) convictions in the same proceeding." *United States v. Robles*, 709 F.3d 98, 101 (2d Cir. 2013). Accordingly, under *Robles*, a finding of guilt on multiple § 924(c) counts

31

charged in the same indictment could give rise to so-called "stacked" mandatory minimum sentences of 25 years for the second and each subsequent conviction.

Shortly after Eldridge was sentenced, however, in December 2018, Congress enacted the First Step Act. Section 403(a) of the First Step Act amended § 924(c)(1)(C) to provide that the 25-year mandatory minimum consecutive sentence would apply not to a "second or subsequent conviction" but instead to a "violation of this subsection that occurs after a prior conviction under this subsection has become final." Pub. L. No. 115-391, 132 Stat. at 5221–22. The effect of the amendment was this: After the Act, defendants whose § 924(c) convictions resulted from a single prosecution—like Eldridge—would no longer be subject to the enhanced statutory minimum at sentencing.

Section 403(b) specifies that the amendment applies to "any offense that was committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment." Pub. L. No. 115-391, 132 Stat. at 5222. Eldridge contends that he is entitled to receive the benefit of the lower penalty established under the First Step Act for his second § 924(c) conviction—

that is, Count Seven—because his "sentence is pending on direct review." Eldridge Br. at 72. We disagree.

We have long held that "[i]t is the oral sentence which constitutes the judgment of the court." *United States v. Werber*, 51 F.3d 342, 347 (2d Cir. 1995) (alteration in original) (quoting *United States v. Marquez*, 506 F.2d 620, 622 (2d Cir. 1974)). Accordingly, for the purposes of Section 403(b), a sentence is "imposed" when the district court orally pronounces it. In reaching this conclusion, we join the unanimous views of those other circuits that have considered the issue. *See, e.g.*, *United States v. Smith*, 967 F.3d 1196, 1213 (11th Cir. 2020) (holding same and collecting cases), *cert. denied*, No. 20-7404, 2021 WL 1520926 (U.S. Apr. 19, 2021). Our holding also accords with our recent decision in *United States v. Bryant*, 991 F.3d 452, 454 (2d Cir. 2021), where we held that a defendant was not eligible for the lower penalties for certain drug offenses provided under Sections 401(a) and 401(c) of the First Step Act—the latter being identically worded to Section 403(c)—because the defendant had been sentenced in 2007. In *Bryant*, we explained that the defendant's sentence was "imposed" when originally pronounced, not when

33

it was later reduced pursuant to Section 404(b) of the First Step Act. 991 F.3d at 456. Eldridge does not challenge this proposition or the fact that his sentence was imposed before the First Step Act was passed. That, then, would appear to be the end of the matter.

However, Eldridge argues that under *Griffith v. Kentucky*, 479 U.S. 314, 316 (1987), the "new rule" of amended § 924(c)(1)(C) applies to his case since his sentence is "pending on direct review or not yet final." But *Griffith* spoke to whether judicial pronouncements of new constitutional rules of criminal procedure are to be applied in cases on direct appeal or otherwise not final; it "did not purport to apply to congressional statutes to which the general saving statute applies." *United States v. Richardson*, 948 F.3d 733, 751 (6th Cir.) (internal quotation marks and alteration omitted), *cert. denied*, 141 S. Ct. 344 (2020). Had Congress wanted, it could have applied the revised penalty structure of Section 403(a) of the First Step Act to sentences that were not yet final (including cases like Eldridge's, which is still pending on direct appeal). But it did not do so. Instead, it keyed the new law to whether the sentence had "not been imposed" as of the date of the

enactment. Thus, Eldridge, whose sentence was imposed before the passage of the First Step Act, is not entitled to the lower sentence provided in the amended version of § 924(c)(1)(C).[17]

## III. CONCLUSION

In sum, we hold as follows:

(1) Where the district court has made on the record an independent decision

      to install a waist-high curtain around defense tables prior to the

---

[17] We express no opinion, however, on whether Section 403(a) of the First Step Act applies at a defendant's *re*sentencing following vacatur of a defendant's original erroneous sentence, where the First Step Act was enacted after the original sentencing but before resentencing. Our sister Circuits are divided on this question, and on the question of whether it matters if a defendant's original sentence was vacated before or after the First Step Act was enacted. *Compare United States v. Uriarte*, 975 F.3d 596, 602 & n.3 (7th Cir. 2020) (en banc) (holding that Section 403(a) applied at a resentencing, where a defendant's original sentence had already been vacated when the First Step Act was enacted, but leaving open whether it would apply if the sentence had been vacated after enactment of the Act); *United States v. Henry*, 983 F.3d 214, 227–28 (6th Cir. 2020) (same); *United States v. Bethea*, 841 F. App'x 544, 551 (4th Cir. 2021) (holding that Section 401 applied at a resentencing regardless of whether the original sentence was vacated before or after enactment of the First Step Act because the original sentence was a "legal nullity"), *with United States v. Hodge*, 948 F.3d 160, 164 (3d Cir. 2020) (holding that Section 403(a) did not apply at a resentencing, where a defendant's original sentence had already been vacated when the First Step Act was enacted); *United States v. Jackson*, 995 F.3d 522, 525–26 (6th Cir. 2021) (distinguishing *Henry* and holding that Section 403(a) did not apply at a resentencing where the original sentence was vacated after enactment of the First Step Act). We have thus far declined to resolve either of these issues for ourselves, *see McCoy*, 995 F.3d at 64–65, and we have no occasion to do so here, since we affirm Eldridge's sentence in its entirety.

commencement of trial, and where the decision reflects a reasonable balance of the defendants' rights to a fair trial with considerations of courtroom safety and security, that decision is within the trial court's discretion and does not provide a ground for a new trial.

(2) It is the defendant's burden to satisfy each of the four requirements for relief under the plain-error standard, including showing that his substantial rights were affected, even when the unpreserved claim of error is based on a supervening change in case law.

(3) Although at least one of the three predicate theories supporting Eldridge's § 924(c) conviction for Count Seven is invalid in light of *Davis* and *Barrett*, we conclude that the instructional error did not affect Eldridge's substantial rights under plain-error review because another of the predicate theories—attempted Hobbs Act robbery—remains a valid basis for a § 924(c) conviction. In light of the overwhelming evidence of Eldridge's guilt and the jury's verdicts on other counts, there can be no doubt that the jury still would have returned a guilty verdict on Count

Seven even if the only theory presented had been attempted Hobbs Act robbery.

(4) Eldridge does not benefit from Section 403(a) of the First Step Act because his sentence was imposed when it was orally pronounced by the district court, before Congress enacted the Act; thus, the 25-year minimum sentence for his second § 924(c) conviction was proper, even though his case is still on direct appeal.

For the foregoing reasons, as well as those given in our accompanying summary order, we **AFFIRM** Eldridge's and Allen's convictions and sentences in all respects.